**Attachment 2**

**Complaint**



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

DJT PROPERTIES, LLC, a Michigan limited
liability company,

No. 2021- **00687** -CZ
CBB

Hon. _____
CHRISTOPHER P. YATES
(P-41017)

          Plaintiff,

v

CITY OF ROCKFORD, a Michigan municipal
corporation, the CITY OF ROCKFORD
PLANNING COMMISSION, and the CITY
OF ROCKFORD CITY COUNCIL,

          Defendants.

_____/

Christian E. Meyer (P56037)
Gaetan Gerville-Reache (P68718)
Lucy J. McManaman (P84720)
WARNER NORCROSS + JUDD LLP
150 Ottawa Avenue NW
Grand Rapids, MI 49503
616.752.2000
Attorneys for Plaintiff

_____
_____
_____
Attorneys for Defendants

There is no other pending or resolved civil action arising out of the same
transaction or occurrence as described in this Complaint.

### COMPLAINT AND JURY DEMAND

Plaintiff DJT Properties, LLC ("**DJT Properties**"), by and through its attorneys, Warner

Norcross + Judd LLP, states its Complaint against the City of Rockford ("**City**"), the City of

Rockford Planning Commission ("**Planning Commission**"), and the City of Rockford City

Council ("**City Council**") as follows:

## INTRODUCTION

1.      Defendants have singled out DJT Properties' mixed-use commercial building at 8 East Bridge Street NE in downtown Rockford (the "**Subject Property**") with unlawfully discriminatory, unreasonable, and confiscatory zoning restrictions.  These restrictions (referred to as the "**Promenade PUD**" and further defined below) have prevented DJT Properties from fully leasing the ground floor of the Subject Property for years, despite the fact that numerous tenants— whose uses are allowed in the ground floor of every other building in downtown Rockford outside of the Promenade PUD—are interested in leasing ground floor space in the Subject Property.

2.      DJT Properties submitted an application ("**PUD Application**") to expand the permitted uses allowed in the ground floor suites of the Subject Property to be more consistent with the uses permitted as of right in every other property in downtown Rockford outside of the Promenade PUD.  The Planning Commission and City Council instead approved an amendment to the Promenade PUD that still prohibited nearly every single new use DJT Properties requested ("**PUD Decision**").

3.      The Planning Commission and City Council, in making this decision, essentially ignored the standards in the Rockford Zoning Ordinance ("**Zoning Ordinance**") for approving such changes, and instead relied on their subjective preferences to continue imposing the overly restrictive regulations, treating the Subject Property as if it were privately owned or controlled by the City.

4.      The Defendants' official acts and the use restrictions they have chosen to impose on the Subject Property violate the Zoning Ordinance, the Michigan Zoning Enabling Act ("**MZEA**"), and the Michigan and United States Constitutions.

2

## PARTIES, JURISDICTION, AND VENUE

5.      DJT Properties is a Michigan limited liability company, with its principal business address at 262 South Fremont Street, Rockford, Michigan 49341.

6.      The City is a Michigan municipal corporation, with its principal business address at 7 Monroe Street, P.O. Box 561, Rockford, Michigan 49341.

7.      The City Council is the City's legislative body.

8.      The Planning Commission is the City Council's advisory body for land use decisions and is responsible for planning decisions.

9.      The Court has jurisdiction over this matter under the 1963 Michigan Constitution, Article VI, Section 13; MCL 600.751; and MCL 600.605.

10.     The scope of this action includes both state and federal claims, both of which this Court has jurisdiction to adjudicate.

11.     Venue is appropriate in this Court pursuant to MCL 600.1605 and MCL 600.1615.

## FACTS

**The Original Property, PUD Agreement, and Parking Arrangement**

12.     The property located at 8 and 10 East Bridge Street in downtown Rockford is currently comprised of two connected mixed-use commercial buildings (one of which is the Subject Property) and an adjacent parking lot (the "**Original Promenade Parcel**").

13.     In 1923, the City purchased the Original Promenade Parcel from Consumers Power and undertook construction of a new water facility in 1925 and 1926.

14.     In 1976, the City started considering utilizing wells for its water source; and in 1999, the City replaced the water plant with wells located outside of downtown Rockford.

15.     Having no further use for the Original Promenade Parcel, the City sold the Original Promenade Parcel to Promenade of Rockford, LLC ("**Promenade LLC**") in 2005.  The purchase agreement stated in part that the Original Promenade Parcel must be developed and used as specified in a development agreement between the City and Promenade LLC.  (The City is in possession of the purchase agreement and development agreement.)

16.     On April 11, 2005, the City Council passed Resolution 05-13 to rezone the Original Promenade Parcel from C-2 (which is what the remainder of downtown was and remains zoned) to PUD and impose use restrictions through a development agreement executed on the same day ("**Promenade PUD**" and "**PUD Agreement**," respectively).

17.     The Promenade PUD, through the PUD Agreement, narrowly restricted the use of the Subject Property's first floor to farm-to-fork "sit down" restaurants and specialty retailers as follows:

A.     The Project may include a "sit down" restaurant that uses a wait staff, serves the majority of its meals for sit-down, on premises consumption, serves alcoholic beverages by the glass pursuant to the liquor license acquired by the Owner for this Project, and prepares most menu items on-site and from "scratch" using fresh ingredients.

B.     The Project may include within the first floor specialty retailers.  The retailers shall not be cut-rate or discount retailers.  Moreover, the occupants shall not include the sale of candles or incense as a primary item for sale, shall not be a tobacco store, shall not provide tattoos, body or ear piercing or similar services, shall not provide video rentals or sales, shall not sell obscene or pornographic materials or any materials displaying pictorially or in any other manner any male or female genitalia or female breasts, shall not sell sexual devices or aids, shall not be primarily in the business [of] showing, renting, loaning or selling videos or DVD's, shall not sell cold beer by the bottle, shall not sell liquor by the bottle (the sale of fine wines by the bottle is acceptable), shall not play music or have other sound at a volume such that it can be heard outside the store, shall not have flashing, oscillating, or twinkling lights visible outside the store, shall not be a convenience store or general grocery store, shall not primarily sell lingerie, and shall not contain the following uses: offices on the ground floor, dry cleaners, grocery store, pharmacy, banks, convenience store, beauty

4

shop/spas, arcade, drive-in restaurant, rent to own, second hand stores, dollar stores, video rental, buffet style restaurants, adult book stores, taro card, medical, bead store, pet store, or fast food.

C.   The Project may within the first floor include specialty food retailers such as an upscale bakery, deli or coffee shop.  By way of example, Subway, Blimpies, and similar sandwich shops are not retailers meeting this definition and shall not be permitted to occupy the Project.  No fast food restaurant meets this definition, including, without limitation, any Wendy's, Arby's, Burger King, McDonald's, Hardees or similar mass-marketed chains and they shall not be permitted to occupy the Project. Dunkin Donuts and similar mass-marketed, limited focus bakery users shall not be permitted to occupy any part of the Project. The first floor may also include an ATM subject to Planning Commission approval.

D.   The second floor of the Project may include any use allowed within the first floor and professional offices including, but not limited to, physicians, dentists, attorneys, accountants, stock brokers and insurance sales.  Banks, insurance claims offices, medical laboratories or phlebotomists, telephone sales firms and similar office uses shall not be permitted.

18.   The stated goal of the PUD Agreement was "to assure that the Property and the Project are used and occupied by businesses that are 'destination' businesses drawing upscale shoppers to the City's downtown."

19.   A "destination" business is commonly understood to be one that is marketed, branded, and advertised to attract customers to that location and does not depend on passing foot traffic or heavy population to attract customers.

20.   Within a year of the PUD Agreement being signed, Promenade LLC constructed two 2-story, mixed-use commercial buildings together with related parking, landscaping, and other site improvements.

21.   The typical parking ratio for a suburban office, retail, and restaurant building like the Subject Property is approximately one parking spot for 200 to 300 square feet of building area.

22.     When the Subject Property was built, the dedicated parking lot that was part of the Original Promenade Parcel was sized with a ratio of one parking spot to 290 square feet, within that typical suburban parking ratio.

23.     As will become clear, the availability of an adequately-sized and dedicated parking lot played a critical role in allowing the destination businesses to initially succeed in the Original Promenade Parcel.

**The Parcel Split and the City's Acquisition of the Parking Lot for Public Parking**

24.     In 2008, Promenade LLC ran into financial difficulties that forced a split of the two Original Promenade Parcel buildings and the parking lot.

25.     On August 11, 2008, both buildings and parking lot were split into three separate parcels of land.

26.     The parking lot was sold to the City by Promenade LLC.

27.     The 10 East Bridge Street parcel ("**Nature View Building**") was also sold and is now owned by Nature View Properties, LLC ("**Nature View**"), a Michigan limited liability company.

28.     Promenade LLC retained only the Subject Property.

29.     After purchasing the Promenade parking lot for public use, the City granted Nature View a right to purchase the parking lot in the event that the City (1) received a written offer to purchase the parking lot which the City intended on accepting or did accept, or (2) discontinued the use of the parking lot as a public parking lot.  This basically ensured that the owner of the Subject Property would most likely never be able to control its own parking situation.

**DJT Properties Purchases the Subject Property**

30.     In 2010, Dan Trierweiler heard that a bank had taken possession of the Subject Property from Promenade LLC and was foreclosing on the property.

31.     Mr. Trierweiler has always been invested in the wellbeing of his hometown, Rockford.  For instance, in the late 1990s when the Original Promenade Parcel was still a water plant, he granted a $250,000 easement across his property, without compensation, so that the City could run a water line for Rockford's water system, and he invested the seed money that helped open a family YMCA in Rockford.

32.     As Mr. Trierweiler recently explained to the Planning Commission and City Council, "[w]hen the Promenade was in foreclosure, it struck me that such a beautiful building in our city, [should] not be owned by an out-of-town landlord.  It made sense to me that this was another investment that I could make that would help Rockford grow."

33.     Mr. Trierweiler, through DJT Properties, purchased the Subject Property on September 29, 2010.

34.     Mr. Trierweiler knew there were use limitations on the Subject Property, but he had worked harmoniously with the previous Rockford city manager, Michael Young, in the past.

35.     Concurrently with the purchase, the City and DJT Properties executed an Amended and Restated Development Agreement to amend the PUD Agreement.  As part of the purchase, the limited uses in the Promenade PUD were expanded slightly to include specialty grocery stores on the first floor.  (The City is in possession of the amended and restated development agreement.)

36.     Though Promenade LLC suffered financial difficulties, Reds on the River ("**Reds**") was making do in the ground floor space in the Subject Property when Mr. Trierweiler purchased the Subject Property.

37.     The lack of control over the now-public parking lot presented a challenge for Reds, but Mr. Trierweiler anticipated the building at 12 East Bridge Street ("**Rockford Brewing Company Building**"), across from the parking lot, would become an office building, which would allow agreeable parking usage in the now-public parking lot.

**Rockford Brewing Company Opens Its Doors in 2012, Further Cramping the Parking Lot**

38.     For the two years immediately after Mr. Trierweiler purchased the Subject Property, the now-public parking lot still served its purpose for the Promenade PUD, including the Subject Property.

39.     But in December of 2012, the Rockford Brewing Company (the "**Brewery**") opened its doors across the parking lot from the Promenade building in the Rockford Brewing Company Building and rendered the parking situation intolerable.

40.     It is important to understand that the Promenade PUD parking lot was never contemplated to be a high-volume lot.

41.     The parking lot—with only 53 spaces—is shaped like a funnel with no outlet. Patrons who venture to the back of the parking lot to find a likely nonexistent parking spot find themselves trapped in a narrow corridor with very limited ability to turn around.  See attached **Exhibit A** (P6 is the Promenade PUD parking lot).  This caused a frequent gridlock that frustrated patrons of *all* the surrounding businesses.

42.     The parking lot was designed for patrons to pull in, find a spot, park, and then re-orient their car to leave the parking lot when they leave the parking spot.  There is no thoroughfare wide enough to support cars circling the lot when they cannot find a spot.

43.     Reds complained to Mr. Trierweiler that customers were unable to find parking in the adjacent parking lot due to the Brewery's customers using the spots.  Reds was then forced to

use valet parking to accommodate its diners. The valets had to take the cars, turn them around, and go park them in a different, further city lot on the other side of the White Pine Trail from the Promenade PUD (the "**South Squires Public Parking Lot**"). See attached **Exhibit A** (P7 is the South Squires Public Parking Lot).

44.     Working with the then City Manager Michael Young, Mr. Trierweiler attempted to remedy the parking issues by negotiating a one-way path for vehicles across the White Pine Trail. They devised a plan that would permit traffic to move into the South Squires Public Parking Lot across the trail to get back to Bridge Street via Squires Street or Towers Drive. See **Exhibit A**.

45.     City Manager Young informed Mr. Trierweiler that one member of the Planning Commission, David Rasmussen, owned a business and/or commercial buildings at 30 and 36 East Bridge, very close to the South Squires Public Parking Lot to which the Promenade parking lot overflow would be connecting. Mr. Young warned Mr. Trierweiler that Mr. Rasmussen would be opposed to the Promenade PUD's traffic crossing of the White Pine Trail and use of that parking lot, and that he had other commissioners who would support him no matter what.

46.     Mr. Rasmussen was one of the deciding votes in turning down the request to create a passage across the White Pine Trail to alleviate some of the Promenade PUD's parking burdens.

47.     At that point, the City was essentially asking DJT Properties to make an impossible situation function.

48.     Reds already had an established customer base when the parking situation became inadequate for patrons, but not even Reds was able to sustain the damage done in depriving it of a dedicated parking lot.

49.     In 2016, Reds' lease with DJT Properties expired, and the restaurant's owners decided to relocate to a location with dedicated parking. In a public statement to MiBiz, the COO

of the owner restaurant group said the restaurant was "limited by the current lease, parking area, and the constraints of the building."

50.     Mr. Trierweiler offered to reduce the rents and accommodate Reds so it would continue renting the entirety of the ground floor space in the Subject Property, but that still left the problem with the parking, which Mr. Trierweiler could not remedy.  Reds declined the offer.

51.     Convenient parking is an essential part of an upscale shopping or dining experience. In a survey of 6,000 drivers in the United States, a shocking 63% reported they would avoid driving to a destination due to the challenge of finding parking, "dramatically impacting local businesses and economic activity."

52.     Far from the ratio of one parking space for every 200 to 300 square feet of building, the buildings surrounding the now-public parking lot in the Promenade PUD create a ratio of one parking space to approximately 720 square feet of building area.

53.     A recent appraisal of the Subject Property (provided to the City's assessor) revealed that the lack of available on-site parking damaged the value of the Subject Property.

54.     With another restaurant now consuming parking spaces in the evenings, backups in the parking lot frustrating patrons, and no ability for DJT Properties to control the parking lot or create a new exit, the goal of using the Subject Property to attract upscale diners to downtown Rockford was thwarted.

**Another Prestigious Restaurant Tries to Use the Space and Quickly Fails**

55.     After an arduous search for a new tenant, the Ben Muller Realty Company ("**Muller Realty**") finally convinced the Essence Restaurant Group ("**Essence**") to come in and sign a 10-year lease.  Essence is an extremely successful restaurant group that has served the Grand Rapids

Metro area with restaurants such as Bistro Bella Vita, Grove, and The Green Well.  The only condition was that Mr. Trierweiler make renovations to the space to better suit Essence's needs.

56.     Importantly, the space also needed to be downsized because Essence and Mr. Trierweiler, who has been operating restaurants since 1967, recognized that the space was too large for the amount of parking available at the dinner hour.

57.     Mr. Trierweiler obliged in the hope that this would become The Green Well's second successful location in the Grand Rapids area.

58.     He expended over $260,000 renovating the restaurant space.  The space was split into a large restaurant space (the "**Green Well Space**") and two, smaller tenant spaces on either side of the restaurant space.  The space south of the restaurant (the "**Small Tenant Space**") is unoccupied, and the space north of the restaurant (the "**Flavors Space**") is occupied by Flavors on the Promenade, an ice cream shop.

59.     After The Green Well opened in April of 2017, Essence listened to the feedback from Rockford patrons and decided to pivot to a more family-friendly option.  The re-branded restaurant, the Rockford Riverside Grille, opened its doors in March of 2018.  It was specifically designed for and targeted at downtown Rockford patrons.

60.     The Rockford Riverside Grill closed its doors in September 2018.

61.     Essence attempted to transition and utilize the space for events and banquets, making the best of a beautiful, large space situated right on the Rogue River with an enchanting outdoor area.  But it did not meet the restrictive provisions of the Promenade PUD, and the City refused to be flexible, so Essence was blocked from utilizing the space as an event or banquet space.

62.     As a result, The Green Well Space has been vacant since it closed in 2018.

11

63.     The Small Tenant Space has remained vacant since it was created in 2016 to accommodate The Green Well's space needs.

64.     The closing of the Rockford Riverside Grille, and inability to lease the Small Tenant Space, showed that the Promenade PUD was no longer viable.

65.     The Green Well Space had been filled by *exactly* what the PUD Agreement had envisioned, an upscale restaurant run by a prestigious restaurant group.  This was the ultimate measure of how well the space could attract upscale patrons.  The restaurant even pivoted to try to meet the needs of Rockford residents.

66.     But ultimately, not even a restaurant curated to serve Rockford's downtown patrons could survive in the space.

**The Property Sits Vacant, Despite Efforts of Two Prestigious Real Estate Firms**

67.     The two vacant spaces in the Subject Property now sit empty, despite being marketed by two large, well-respected real estate agencies: Colliers International ("**Colliers**") and Muller Realty.

68.     Essence hired Colliers to re-let its space after the City refused to allow the Green Well Space to be used as a banquet hall.  Muller Realty has been the dedicated agent of the Subject Property since Mr. Trierweiler bought the Subject Property in 2010.

69.     Now, Muller Realty is the only agent leasing the space, as Essence's lease with DJT Properties has been terminated pursuant to the terms of a settlement agreement.

70.     Elliot Muller, one of the listing agents, explained that there has been a lot of interest in the space.  However, the Promenade PUD limitations prevent people from being able to lease either of the spaces.  The restrictions force tenants to look for other spaces in downtown Rockford.

71.     Efforts to lease the space to tenants that would fit the uses included not only listing the property as usual, but also posting signs in windows, posting sings in yards, listing on LoopNet, and communicating directly with the West Michigan brokerage community.

72.     Additionally, Muller Realty has directly marketed to 88 restaurants, 49 retailers, and 42 boutiques.  In 2020, Muller Realty showed the property 20 times.  That resulted in three offers to lease the space, none of which could be accepted by DJT Properties because the business did not fit the narrow use restrictions of the Promenade PUD.

**The Layout of the Property Impedes Its Use for Retail**

73.     The problem with leasing the property for the narrow set of uses allowed under the restrictive Promenade PUD is not just limited to the lack of adequate parking for upscale restaurant use but also the unsuitability of the building's location and orientation for the only other option made available under the Promenade PUD—specialty retail or specialty grocery.

74.     Currently, the Subject Property has three suites on the first floor and 15 suites on the second floor.  On the first floor there is the approximately 1,338-square-foot Small Tenant Space that is currently vacant, the approximately 5,500-square-foot Green Well Space that used to house the restaurants, and the Flavors Space.  On the second floor, there are fifteen spaces: ten executive offices and five larger office spaces.  Four of the spaces on the second floor are currently unoccupied.

75.     The suites on both floors boast views of the Rogue River and some of the Rockford Dam, and the Green Well Space was recently renovated, making the Subject Property an extremely desirable piece of real estate.

76.     But despite the attractive qualities of the building, the Promenade PUD has clear and recognized shortcomings that inhibit the leasing of the Subject Property for retail.

77.     In terms of location, the Promenade is detached from the heart of downtown, and lacks the cohesiveness and walkable character of the downtown Rockford shopping district.  The random development pattern and numerous curb cuts, including a gas station, on East Bridge Street make this location unconducive to window shopping.

78.     In terms of orientation, the Promenade building is a long rectangular shape, with a perpendicular orientation to Bridge Street.  Only a small portion of the building (the portion occupied by Flavors) actually faces Bridge Street.  The Subject Property lacks the drive-by visibility sought after for retail use.

79.     The front of the Rockford Brewing Company Building sits only 14 feet from the sidewalk; the Promenade building sits around 38 feet from the sidewalk, and thus, when viewed from much of the remainder of downtown by window shoppers or walkers, sits behind the Rockford Brewing Company Building, hidden from view.

**DJT Properties Seeks to Expand the Permitted Uses in the PUD Agreement**

80.     The Promenade PUD is the only PUD in downtown Rockford.  Every property owner within downtown, except for those in the Promenade PUD (i.e., the Subject Property and the Nature View Property), has the right to use their property for a broad range of uses, including office, medical office, salon, and other personal services by right.  No land use approval processes are required.

81.     The march of time has demonstrated that the type and nature of the uses listed in the Promenade PUD have failed to be successful.

82.     Because the current permitted uses in the Promenade were not functioning for the Subject Property, DJT Properties attempted to work with the City by applying for rezoning to permit additional uses.

14

83.     The expanded uses would have still permitted the City to exercise significant regulatory control over the Subject Property while giving DJT Properties the flexibility to actually fill the spaces.

84.     Nature View supported the approval of DJT Property's application due to Dan Trierweiler's dedication to the Rockford community.

85.     DJT Properties hired Suzanne Schulz of Progressive AE to assist with compiling the application.

86.     Ms. Schulz served as Grand Rapids' Managing Director of Design and Development and Director of Planning for nearly 20 years.  She specializes in urban planning, transportation planning, and policy development.

87.     With her assistance, DJT Properties prepared an application for extended uses that would maintain the continuity and charm of Rockford's downtown area while still permitting economic viability in the Promenade.

88.     Recognizing the City's attachment to the original PUD Agreement, DJT Properties agreed to retain the original use restrictions on the Flavors Space, in order to "insure that the continuity of the desired retail and restaurant uses originally envisioned for the site are preserved and that an active street edge is maintained."

89.     The uses requested by DJT Properties in its application ("**Expanded Permitted Uses**") were:

> A.     National "fast casual" restaurants (e.g., Panera) in the Green Well Space and the Small Tenant Space;
>
> B.     Specialty food retailer that may sell beer and spirits (in addition to wine) subject to Special Land Use ("**SLU**") approval, in the Green Well Space and the Small Tenant Space;

C.  General retail uses, excluding dollar stores, in the Green Well Space and the Small Tenant Space;

D.  Art gallery and assembly/collaborative space, subject to SLU approval, in the Green Well Space and the Small Tenant Space;

E.  Business office-service uses such as real estate, financial services and brokerage in the Green Well Space and the Small Tenant Space; and

F.  Residential on the second floor.

90.     On November 21, 2019, Ms. Schulz gave a carefully planned presentation to the Planning Commission.

91.     After Ms. Schultz presenting her thoughts on the best uses for the Promenade, Commissioner Lisa Chamberlain asked her, "*what gives you the right to come here from the big city and tell us small town people how to run our business?*"

92.     A major point of contention with the Planning Commission was office space on the first floor.

93.     The Master Plan of Rockford states the following vision for the central business district of Rockford:

> With respect to land uses, downtown is envisioned to be a retail center.  Some office uses may be appropriate but can have a negative impact by taking prime, street-level, retail space in highly visible locations.  It is strongly recommended that efforts be made to retain street-level space for retail and similar uses, while encouraging the use of upper stories of downtown buildings as either residential or office.  This may require the modification of some existing codes to permit the needed renovations to occur in a cost effective manner.

94.     The current Master Plan of Rockford clearly permits some office use in downtown, and the Promenade is actually the best place to permit office space because the Master Plan is concerned with office space taking "highly visible" locations from retail, and as described above only the Flavors Space is "highly visible."

16

95.     In fact, office use is permitted as of right in the entirety of downtown in areas that are exceedingly more visible than the Promenade.

96.     The City employed Paul LeBlanc of PLB Planning Group, a Michigan limited liability company in Ada, Michigan, to be the consulting planner in considering DJT Properties' request for the Extended Permitted Uses.

97.     Mr. LeBlanc prepared a memorandum for the City Planning Commission in which he explained that the Promenade, despite being a beautiful building, suffers from the location and orientation issues described, which inhibit easy retail use.

98.     Of the three uses permitted on the first floor under the PUD Agreement, two of them are retail shops.

99.     The City's consultant also stated to the Rockford Planning Commission on August 27, 2020, that the lack of visibility "rules out retail" in the empty spaces in the Subject Property.

100.    He goes on to say that even if the space was able to attract retail, "it won't last for long."

101.    It is undisputed that the Promenade is detached from the central business district of Rockford, and is obscured from view due to its layout.

102.    As the City's own consultant, Mr. LeBlanc, stated:

> Despite its physical presence within downtown, the Promenade suffers from being disconnected from the heart of downtown activity (stores, foot traffic, riverfront park, etc.) and a suburban style strip center design orientated perpendicular to the adjacent street.  It is the perpendicular orientation of the building, in particular, that inhibits its suitability for many uses.  Retail needs visibility in order to draw customers in, or there needs to be a strong attraction to lure customers to cross Bridge Street or motivate them to drive to a particular business.

103.    Mr. LeBlanc, as the City's planning consultant, recommended ground floor uses that included an art gallery or similar exhibit space, hair and nail salons, and medical offices.  Ms. Schulz agreed with Mr. LeBlanc on everything he recommended.

104.    Despite the recommendations, the leasing history, and the continuing vacancy of the Subject Property, the Planning Commission only allowed two new uses: (1) specialty food retailers (which were previously only allowed to sell wine) were now also permitted to sell beer and spirits *if* the City granted special land use approval, and (2) DJT Properties could now lease the second floor for residential use.  The Planning Commission did not allow any of the other first floor uses.

**The Planning Commission Allows Rasmussen to Participate Despite His Conflict of Interest**

105.    In addition to demonstrating unwillingness to heed the advice of the retained city planner consultants, the City Planning Commission failed to give DJT Properties' PUD Application fair consideration.

106.    Dave Rasmussen, the same city commissioner who was involved with denying Mr. Trierweiler's application for the easement over the White Pine Trial, was very involved in the consideration of the PUD Application.

107.    Not only does Mr. Rasmussen own commercial buildings at 30 and 36 East Bridge Street with tenants who use the public parking lots in the vicinity for their customers, but also Mr. Rasmussen's wife is one of those business tenants and would likely be directly affected by the competition for parking.

108.    Commissioner Jim Scales, on the other hand, recused himself from considering this application due to his representation of Trendwell, which is the main tenant of Nature View.

109.    This should have been Mr. Rasmussen's cue to recuse himself as well.

110.    But Mr. Rasmussen opted instead to be an extremely vocal and involved in the consideration process, openly opposing the first-floor-office-space use for the Promenade because of parking.

111.    At a Planning Commission subcommittee meeting on December 10, 2019, in the presence of City Manager Thad Beard, Mr. Rasmussen asked Mr. Trierweiler how many employees he envisioned working in the Promenade if it was approved for office space use.

112.    Mr. Trierweiler estimated the number of employees to be a couple dozen.  Mr. Rasmussen then asked Mr. Trierweiler where those employees would park, and Mr. Trierweiler responded across the South Squires Public Parking Lot due to restricted parking at the Promenade.

113.    Mr. Rasmussen explained that the city lot to which Mr. Trierweiler was referring was the parking lot for *his* customers.  Mr. Rasmussen concluded that he would be unable to support the office request due to the potential for shared parking.

114.    City Manager Thad Beard was sitting across the table from Mr. Rasmussen when he made these statements but never offered any comment on this reasoning.

115.    It is objectively clear that Mr. Rasmussen would be affected by expanding the uses of the PUD Agreement, as it may detract tenants from the buildings he owns.

116.    For this reason, Mr. Rasmussen should have recused himself from any and all involvement with the PUD Application.

117.    It is also clear that other commissioners on the Planning Commission and the City Council were unwilling to check this conflict of interest as Mr. Rasmussen actively participated in all Planning Commission and City Council discussions of DJT Properties' PUD Application.

**The Planning Commission and City Council Grant Rezoning that Effectively Prohibits the Bulk of the Expanded Permitted Uses Requested in the Application, without Giving Any Official Reason for the Restrictions**

118.    The Planning Commission members engaged in no discussion about whether the Expanded Permitted Uses met the Zoning Ordinance standards for PUD rezoning.

119.    Instead, their discussion centered on how they could maintain control of which specific tenants were allowed to use the property.

120.    Several Planning Commission members revealed their desire to vet each and every proposed lessee.

121.    The Planning Commission's discussion also revealed a preference among some Planning Commission members that the space serve as a restaurant and that the space remain vacant until such a tenant could be found; they were concerned that approving business or medical office use would, as a practical matter, foreclose their dream that the space reopen as a restaurant.

122.    At no point, however, did the Planning Commission evaluate whether the Expanded Permitted Uses met the standards for PUDs in the Zoning Ordinance or explain why they proposed rezoning that prohibited the bulk of the Expanded Permitted Uses.

123.    Once the Planning Commission made its decision on the PUD Application, it sent its proposed resolution for rezoning to the City Council for approval.

124.    The City Council followed the Planning Commission's recommendations and approved the rezoning that prohibited the bulk of the Expanded Permitted Uses, again, without any official explanation or reasons for the prohibitions on those Expanded Permitted Uses under the applicable standards in the Zoning Ordinance.

125.    City Council Resolution 20-34 ("**Resolution**") stated that the Additional Permitted Uses conform with the Rockford Zoning Ordinance, but gave no explanation as to why the rezoning did not also permit the Expanded Permitted Uses.

**The City Charged DJT Properties Nearly $11,000 for Legal Advice to Interpret Its Own Zoning Ordinance and Consultant Report It Rejected**

126.    After approving rezoning for the Subject Property that still largely prohibits the Expanded Permitted Uses DJT Properties had requested, the City sent DJT Properties bills for its legal fees and planning-consultant fees.

127.    The legal fees amounted to $10,896.50 and the planning-consultant fees amounted to $2,700.

128.    The fees are largely unrelated to actually reviewing and considering DJT Properties' proposal under existing law.

129.    DJT Properties was charged for the work of legal counsel in addressing issues such as preparing the City Council's Resolution and advising the City Manager on how to run meetings.

130.    The planning consultant's fees were for the preparation of a memo that, based on applicable law, recommended that the Planning Commission approve a number of DJT Properties' proposed Expanded Permitted Uses.

131.    However, the Planning Commission declined to follow those recommendations on no basis other than their own unsupported, subjective preferences divorced from the applicable standards in the Zoning Ordinance.

132.    DJT Properties paid the fees under protest and with the full reservation of rights to seek repayment.

## COUNT I
## VIOLATION OF THE ROCKFORD ZONING ORDINANCE
## (WRIT OF MANDAMUS)

133.   DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

134.   The City of Rockford Zoning Ordinance, Section 13.11, identifies specific criteria for approval of a planned unit development and states that the PUD "shall" be approved if those criteria are met.

135.   The Planning Commission, in making its recommendation, was required to review the PUD request "based on the conformance with the standards of Section 13.11" and make a recommendation to the City Council.

136.   The Planning Commission's recommendation to the Council shall include "the reasons for such recommendation, specifically citing appropriate standards and sections of the [Zoning] Ordinance and identifying those specific conditions, if any, it considers necessary." Zoning Ordinance § 13.7.

137.   The City Council, in reviewing the recommendation of the Planning Commission, "shall make its findings based on the standards of Section 13.11."

138.   The PUD Application is processed as an original PUD request under the Zoning Ordinance because it is a major change to the existing zoning of the Property.  Zoning Ordinance § 13.13.

139.   Since it must be reviewed as an original PUD rezoning request, the Planning Commission and City Council were required to review the PUD Application based on the standards set out in the City's Zoning Ordinance and make findings on each criterion in Zoning Ordinance § 13.11.

140.    The Planning Commission and the City Council did not evaluate DJT Properties'

request under the mandatory standards in the Zoning Ordinance and failed to make any findings

as to how the PUD Application did or did not comply with the standards set out in the Zoning

Ordinance.

141.    A writ of mandamus is appropriate when (1) the plaintiff has a clear legal right to

the performance of the specific act sought to be compelled, (2) the defendant has a clear legal duty

to act in the manner requested, and (3) the act to be compelled is ministerial.

142.    Under the Zoning Ordinance, the Planning Commission and City Council had a

clear legal duty to apply the standards for approval of a PUD to the PUD Application and to make

findings of fact based on those standards.

143.    DJT Properties has a clear legal right to performance of that duty under the Zoning

Ordinance.

144.    The Planning Commission and City Council's obligation to use the standards in

Zoning Ordinance § 13.11 to determine whether to approve or deny DJT Properties' PUD

Application and to make findings of fact based on those standards is not discretionary.

145.    The Court should declare that the Planning Commission and City Council have

violated the Zoning Ordinance by failing to apply the standards in Zoning Ordinance § 13.11 to

the PUD Application and failing to make findings of fact on each criterion as to each Expanded

Permitted Use prohibited in the Resolution.

146.    The Court should also enter an order of mandamus compelling the Planning

Commission and City Council to apply the standards for PUD approval in Zoning Ordinance §

13.11 to each Expanded Permitted Use requested in DJT Properties' PUD Application that was

not allowed in the PUD Decision, and to make findings of fact on each criterion with respect to

those specific Expanded Permitted Uses.  The Court should also grant DJT Properties the further relief requested below.

## COUNT II
## VIOLATION OF THE MICHIGAN ZONING ENABLING ACT

147.    DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

148.    Michigan law authorizes local units of government to establish and maintain a planned unit development district only in accordance with the terms of the Michigan Zoning Enabling Act, MCL 125.3101, *et seq.* ("**MZEA**").

149.    Under the MZEA, local units of government in general must always "insure that the land use or activity authorized shall be compatible with adjacent uses of land, the natural environment, and the capacities of public services and facilities affected by the land use."

150.    However, when it comes to zoning planned unit developments, MZEA § 503 only authorizes the legislative body to establish planned unit development zoning requirements that "permit flexibility in the regulation of land development, encourage innovation in land use and variety in design, layout, and type of structures constructed, achieve economy and efficiency in the use of land . . . encourage useful open space, and provide better housing, employment, and shopping opportunities particularly suited to the needs of the residents of this state."

151.    MZEA § 503 further requires that, "[w]ithin a land development project designated as a planned unit development, regulations relating to the use of land, including, but not limited to, permitted uses, lots sizes, setbacks, height limits, required facilities, buffers, open space areas, and land use density, shall be determined in accordance with the planned unit development regulations specified in the zoning ordinance."

24

152. A zoning ordinance that does not comply with these requirements is not valid because it is not authorized by the MZEA.

153. The Zoning Ordinance adopts the Legislature's intent for PUDs described in MZEA § 503, stating:

> It is the intent of this District to provide for flexibility in the regulation of land development; to encourage innovation in land use and variety in design, layout, and type of structures; to achieve economy and efficiency in the use of land, natural resources, energy, and the provision of public services and utilities; to encourage useful open space; and to create better living, working, and shopping environments. In order to accomplish these objectives, this Chapter permits the relaxation of the conventional requirements found in other Zoning Districts.

154. The Zoning Ordinance provides that "[a]ny use permitted by right or special approval in any District may be permitted within a PUD."

155. The Zoning Ordinance includes qualifying conditions for consideration in the PUD District, such as lot size, utility service, open space, and consistency with the City's General Development Plan.

156. The Zoning Ordinance also provides that the PUD "shall be approved" if it complies with specific standards, including satisfying the qualifying conditions, that the uses are consistent with the City's Master Plan, that the PUD is compatible with surrounding uses of land, that it will not be injurious to public health, welfare, and safety, and that it is consistent with the spirit and intent of the PUD District.

157. The Zoning Ordinance establishes that the procedures and standards for approving a major change to the PUD are the same procedures and standards that govern an initial PUD request.

158. The amendment to the Promenade PUD requested by DJT Properties was considered to be a major change by the City of Rockford.

159.    The expanded uses are permitted as of right in all of the remainder of downtown Rockford and satisfy every other lawful standard for approval in the Zoning Ordinance PUD provisions.

160.    The City's prohibition of the Expanded Permitted Uses requested by DJT Properties and its enforcement of the Promenade PUD do anything but permit flexibility and encourage innovation, and are a violation of the above-noted provisions of the MZEA.

161.    The Court should declare the Zoning Ordinance's requirement to enter into a PUD agreement unlawful and invalid, enjoin enforcement of the Promenade PUD and the PUD Agreement on the Subject Property to the extent that they prohibit the Expanded Permitted Uses, and grant DJT Properties the further relief requested below.

### COUNT III
### VOID AND UNENFORCEABLE PUD AGREEMENT

162.    DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

163.    Contracts founded on acts prohibited by a statute, or contracts in violation of public policy, are void.

164.    A local government only has those powers delegated to it by the Michigan constitution and the Legislature.

165.    Local units of government have no powers to zone or impose conditions on land use other than those authorized by the MZEA, and any land use regulation that is not in compliance with the MZEA is unlawful and contrary to public policy.

166.    While the MZEA permits a property owner to "voluntarily offer in writing . . . certain use[s] and development of the land as a condition to a rezoning," it expressly states that "a

local unit of government shall not require a landowner to offer conditions as a requirement for rezoning." MCL 125.3405(5).

167.    Zoning Ordinance § 13.12 unlawfully requires a PUD applicant to enter into a PUD development agreement.

168.    Because it is not authorized by the MZEA, Zoning Ordinance § 13.12 is not a valid exercise of the City's zoning authority or a valid condition of PUD zoning.

169.    The City of Rockford has nevertheless unlawfully enforced that requirement and the existing PUD Agreement against DJT Properties to circumvent its mandatory obligation to apply the Zoning Ordinance standards to a major change to a PUD.

170.    Because the PUD Agreement coerced by the City is against public policy, it is in violation of the MZEA, void ab initio, and unenforceable.

171.    The Court should declare that Zoning Ordinance § 13.12 is unlawful and unenforceable, declare that the PUD Agreement is void and unenforceable, enjoin the enforcement of Zoning Ordinance § 13.12 and the PUD Agreement, and grant DJT Properties the further relief requested below.

## COUNT IV
## UNENFORCEABLE RESTRICTIVE COVENANT

172.    DJT Properties realleges and incorporates the preceding paragraphs as if fully restated herein.

173.    The PUD Agreement is not a restrictive covenant but rather a development agreement entered pursuant to a Zoning Ordinance requirement for PUD zoning.

174.     However, to the extent that it is deemed a restrictive covenant, it should be deemed terminated or unenforceable as a result of the change in conditions in the uses and circumstances surrounding the Subject Property.

175.     Under Michigan common law, a change in the conditions of a neighborhood can warrant a court terminating a restrictive covenant or deeming it unenforceable.

176.     The parking lot's change in ownership and change in use as a public parking lot for the Brewery's customers, the White Pine Trail users, the Rogue River kayak and canoe users, and the other downtown businesses is a change in the adjacent land uses that frustrates the original purpose of restricting the Subject Property to "destination" businesses, as it leaves no dedicated space for those who would be drawn to the location by those businesses.

177.     In light of these changed conditions, the restrictions on uses in the PUD Agreement are obsolete and fail to fulfill the original intent of the PUD Agreement.

178.     The Court should declare that the PUD Agreement, to the extent it is a restrictive covenant, is terminated or is no longer enforceable and grant DJT Properties the further relief requested below.


## COUNT V
## EQUAL PROTECTION – AS APPLIED

179.     DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

180.     The United States Constitution guarantees that no person shall be denied the equal protection of the laws.  US Const, Am XIV.

181.     The equal protection clauses require all persons, including corporations and other business entities, who are similarly situated to be treated alike by their governments.

28

182.   The City's denial of DJT Properties' Application for the Expanded Permitted Uses while allowing such uses as of right in the remainder of downtown is unlawful discrimination, as it is not based on rational distinctions that reasonably advance a legitimate governmental interest, is arbitrary and capricious, and is improperly motivated by animus toward DJT Properties and its agents.

183.   The actions of the City violate DJT Properties' equal-protection rights and, therefore, violate the United States Constitution and the Federal Civil Rights Act, 42 USC 1983.

184.   The Zoning Ordinance only permits amendment to an approved PUD Agreement under specific circumstances.  Zoning Ordinance § 13.13.

185.   The Board of Zoning Appeals has no authority to hear any variance request or waive any requirements related to a PUD.  Zoning Ordinance § 13.10(E).

186.   DJT Properties has complied with all of the submission requirements of an original PUD Application.

187.   Since the Zoning Ordinance precludes the Board of Zoning Appeals from hearing any variance request or waiving any requirements related to PUDs, DJT Properties has exhausted its administrative remedies; thus, the actions of the City in violating DJT Properties' constitutional rights are ripe for review.

188.   This equal-protection violation should be remedied by invalidating the unconstitutional PUD Decision, Promenade PUD, and PUD Agreement, and by granting DJT Properties the further relief requested below.

## COUNT VI
## VIOLATION OF THE DORMANT COMMERCE CLAUSE

189.    DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

190.    The Dormant Commerce Clause of the United States Constitution prohibits Michigan and other states from discriminating against interstate commerce.  US Const, art I, § 8.

191.    The PUD Agreement, as amended, which embodies the use restrictions of the Promenade PUD, explicitly states that the Subject Property shall not include "national submarine sandwich franchises," "national fast-food hamburger chains," or "mass-marketed" bakeries similar to Dunkin' Donuts.

192.    In its Application for Expanded Permitted Uses, DJT Properties requested that the City allow a "fast casual" restaurant in the Promenade, similar to Panera Bread.

193.    The City Council, in making the PUD Decision, voiced its opposition to allowing national chain restaurants into downtown Rockford.  Specifically, a commissioner stated "national food is not the right thing for Rockford."

194.    The PUD Decision, Promenade PUD, and PUD Agreement, on their face and as applied, violate the Dormant Commerce Clause by discriminating against interstate commerce in violation of the United States Constitution and Federal Civil Rights Act, 42 USC 1983.

195.    The Court should declare that the PUD Decision, Promenade PUD, and PUD Agreement are unconstitutional, enjoin the enforcement of the Promenade PUD and PUD Agreement, and grant DJT Properties the further relief requested below.

## COUNT VII
## SUBSTANTIVE DUE PROCESS – AS APPLIED

196.    DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

197.    The Due Process Clauses of the Michigan Constitution and United States Constitution protect the rights of persons, including corporations and other business entities, from deprivation at the hands of arbitrary and capricious government action.

198.    The Promenade PUD and PUD Agreement are not reasonably related to public health, safety, welfare, or any other legitimate government interest.

199.    The Promenade PUD and PUD Agreement, as applied to the Subject Property, constitute an arbitrary and capricious exclusion of legitimate land uses by prohibiting the Expanded Permitted Uses on an isolated parcel in a commercial downtown area where such uses are otherwise allowed.

200.    The City's PUD Agreement and PUD Decision, as applied to the Subject Property, violate DJT Properties' substantive due process rights under the Michigan Constitution, the United States Constitution, and the Federal Civil Rights Act, 42 USC 1983.

201.    The Court should declare that the PUD Decision, Promenade PUD, and PUD Agreement are unconstitutional, enjoin enforcement of the Promenade PUD and PUD Agreement, and grant DJT Properties the further relief requested below.

## COUNT VIII
## PROCEDURAL DUE PROCESS

202. DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

203. The Michigan Constitution and United States Constitution require constitutionally sufficient procedure to ensure fundamental fairness and preclude the government from depriving a person of liberty or property without due process of law.

204. This procedural due process protects an individual with a protected property interest by ensuring that there is a meaningful opportunity to be heard by an impartial decision maker.

205. In allowing Mr. Rasmussen's participation in the Planning Commission's decision-making despite his obvious conflicts and bias, the City deprived DJT Properties of an impartial decision maker in a proceeding that affects DJT Properties' property rights.

206. In doing so, the City thus deprived DJT Properties of its property rights without due process of law in violation of the due process clauses of the United States Constitution and the Michigan Constitution, and the Federal Civil Rights Act, 42 USC 1983.

207. The Court should declare the PUD Decision unconstitutional, enjoin the enforcement of the Promenade PUD and PUD Agreement, which are being enforced pursuant to that unconstitutional decision, and grant DJT Properties the further relief requested below.

## COUNT IX
## TAKING WITHOUT JUST COMPENSATION

208. DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

32

209.    The Michigan Constitution guarantees that "[p]rivate property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2.

210.    The United States Constitution guarantees that private property shall not be taken for public use, without just compensation.  US Const, Am V.

211.    If (1) the character of the governmental action is such that the aggrieved property owner is singled out to pay for the public good, (2) the land use regulation has interfered with the property owner's reasonable investment-backed expectations, and (3) the land has suffered a severe diminution in value, then the government regulation amounts to a regulatory taking and the property owner must receive just compensation.

212.    The PUD Decision, Promenade PUD, and PUD Agreement impose such unique and exacting control over the Subject Property that they essentially single out DJT Properties to subsidize the City's objective of furnishing a destination business for the sake of the rest of the City's downtown businesses at DJT Properties' expense.

213.    The PUD Decision, Promenade PUD, and PUD Agreement, as applied to DJT Properties, interfere with DJT Properties' reasonable investment-backed expectations of making a profit by leasing out the various tenant spaces.  Mr. Trierweiler would not have purchased the space without an expectation that he could make a profit.  This profit expectation has been thwarted by the City's refusal to allow any economically viable businesses on the first floor of the Subject Property.

214.    The land has suffered a severe diminution in value as a result of the PUD Decision, Promenade PUD, and PUD Agreement.

215.    Collectively, the PUD Decision, Promenade PUD, and PUD Agreement amount to a regulatory taking in violation of the Michigan Constitution, the United States Constitution, and the Federal Civil Rights Act, 42 USC 1983.

216.    DJT Properties has been damaged in an amount greater than $25,000.

## COUNT X
## UNLAWFULLY EXCESSIVE FEES

217.    DJT Properties incorporates and realleges the preceding paragraphs as if fully restated herein.

218.    The MZEA authorizes a local unit of government to impose fees that are reasonable.  MCL 125.3406(1).

219.    The City's assessment of its legal and professional costs on DJT Properties is unlawful because the fees are unreasonable.

220.    DJT Properties' Application for Expanded Permitted Uses includes requests for uses already permitted as of right in downtown.  The City is only considering whether it will permit uses of the Subject Property that are already permitted across the street from the Promenade.

221.    The legal fees the City charged DJT Properties were unreasonable and unlawful because rather than being related to the consideration of the application, they were instead related to the solicitation of advice regarding how to run meetings and interpret its own Zoning Ordinance.

222.    The planning-consultant fees that the City charged were unreasonable and unlawful because they were frivolous and unrelated to the City's decision; the City did not actually use, and demonstrated that it had no intention of using, the information, advice, and recommendations of its own planning consultant.

223.   In light of the relatively simple nature of the case and the numerous fees assessed that were unrelated to the application, the fees were excessive and unreasonable and therefore not permitted under the MZEA.

224.   The Court should order the City to return to DJT Properties the amount of fees paid in excess of a reasonable charge, and it should also grant DJT Properties the further relief requested below.

**WHEREFORE**, DJT Properties respectfully requests that this Honorable Court:

A.   Issue a writ of mandamus compelling the Planning Commission and City Council to comply with Zoning Ordinance § 13.11 by applying its standards for PUD approval to DJT Properties' PUD Application and to make findings of fact on each criterion with respect to each Expanded Permitted Use that was not approved in the PUD Decision;

B.   Declare that to the extent they prohibit the Expanded Permitted Uses the City's Promenade PUD Decision, Promenade PUD, and PUD Agreement are unenforceable because they violate the Michigan Zoning and Enabling Act, the Michigan Constitution, the United States Constitution, and/or the Federal Civil Rights Act, 42 USC 1983;

C.   Declare that the property's zoning has reverted to its prior C-2 zoning;

D.   Award DJT Properties monetary damages for the periods during which the zoning operated as a taking of DJT Properties' property;

E.   Reimburse DJT Properties the amount of the excessive fees it paid;

F.   Award DJT Properties damages, costs, and attorney fees;

G.   Award to DJT Properties such other relief as the court may deem appropriate.

## <u>JURY DEMAND</u>

Plaintiffs demand a jury on all issues triable by a jury set forth in this Complaint.

WARNER NORCROSS + JUDD LLP

Dated: January 21, 2021

By _____

Christian E. Meyer (P56037)
Gaetan Gerville-Reache (P68718)
Lucy J. McManaman (P84720)
Business Address:
   1500 Warner Building
   150 Ottawa Avenue NW
   Grand Rapids, MI 49503
   616.752.2000

Attorneys for Plaintiff

20937544-9

EXHIBIT A

# DOWNTOWN ROCKFORD
# PARKING DIRECTORY



| Lot Name | Location |
|----------|----------|
| P1 Garden Park | 35 Courtland |
| P2 Courtland | 114 N. Main |
| P3 Overlook Park | 9 E. Bridge |
| P4 Welcome Center | 8 N. Squires |
| P5 Monroe | 13 N. Monroe |
| P6 Promenade | 0 E. Bridge |
| P7 South Squires | 51 S. Squires |
| P8 Main Street West | 11 S. Main |
| P9 Main Street East | 12 S. Main |
| P10 City Hall | 7 S. Monroe |

## PARKING

 Customer only

 Customer and Employee